IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 22, 2013 Session

## S. A. M. D.  v.  J. P. D.

**Appeal from the Circuit Court for Shelby County**
**No. CT00543806     Donna M. Fields, Judge**

---

## No. W2013-00314-COA-R3-CV - Filed September 30, 2013

---

Appellant/Mother appeals the trial court's post-divorce modification of Appellee/Father's child support obligation, and its finding that Appellant was guilty of various acts of criminal contempt. Appellant/Mother also appeals the trial court's admission of certain evidence. We conclude that the trial court erred in addressing, *sua sponte*, the issue of modification of Appellee/Father's child support obligation in the absence of a petition for modification as required by Tennessee Code Annotated Section  36-5-101(f)(1). Accordingly, we reverse the modification of child support. The order of the trial court is otherwise affirmed. Father's request for attorney's fees incurred in defense of this appeal is granted based upon provisions in the parenting plan and marital dissolution agreement. Affirmed in part; reversed in part; and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed in Part; Reversed in Part; and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., AND HOLLY M. KIRBY, J., joined.

Drayton Durell Berkley, Memphis, Tennessee, for the Appellant, S. A. M. D.

Vickie Hardy Jones, Memphis, Tennessee, for the Appellee, J. P. D.

## OPINION

Issues of post-divorce modification of the primary residential parent and charges of criminal contempt were previously appealed to this Court in the case of ***S.A.M.D. v. J.P.D.***, No. W2011-01256-COA-R3-CV, 2012 WL 5266194 (Tenn. Ct. App. Oct. 25, 2012), *perm. app. denied* (Tenn. June 19, 2013) (***"S.A.M.D. I"***).[1]  In the interests of consistency and judicial economy, we review the relevant factual and procedural history as set out in ***S.A.M.D. I***.  Plaintiff/Appellant S. A. M. D. ("Mother") and Defendant/Appellee J. P. D. ("Father") were married in 2001 and had one child during the marriage, a son ("Son" or "the child") born in July 2003.  ***S.A.M.D. I***, 2012 WL 5266194 at *1.  The parties were divorced by order of February 19, 2010.   The final decree of divorce incorporated an agreed marital dissolution agreement ("MDA") and a permanent parenting plan ("Parenting Plan").  *Id*. Under the Parenting Plan, Mother was designated as the child's primary residential parent. *Id*.  Because Father travels extensively for work, the Parenting Plan provided he would have flexible parenting time, six days each month when his work permitted, so long as Mother was properly notified. *Id*.  On June 7, 2010, Father filed a contempt petition against Mother; the petition also sought injunctive relief and attorney fees ("June Contempt Petition"). *Id*.  Father asserted in the petition that Mother had violated the provisions of the Parenting Plan concerning Father's parenting time. *Id*. Father also alleged that Mother had violated the provisions in the MDA that prohibited harassment and threats and prohibited the parties from placing telephone calls or sending text messages to the other party after 10:00 p.m. except in the event of an emergency involving the child. *Id*.  Father asked the trial court to hold Mother in civil and criminal contempt for violating the Parenting Plan and the MDA, as incorporated into the final decree. *Id.*  He also requested that Mother be required to pay his attorney fees in connection with the motion.  *Id*.

The trial court held a preliminary hearing on Father's June Contempt Petition on the day that it was filed. ***S.A.M.D. I***, 2012 WL 5266194 at *2.  On June 18, 2010, the trial court entered a preliminary order, which granted Father's request to exercise parenting time the week of June 7, 2010. *Id*. (footnote omitted).  To curtail Mother's harassment, the trial court enjoined her from coming within 500 feet of Father "at any time or any place pending further orders of the Court." *Id*.  The trial court noted in the order that it had not prohibited Father's girlfriend from being around Son, and so specifically permitted her to be present during Father's parenting time. *Id.*  The order stated that based on Father's petition and the trial judge's own observations, "Mother's mental condition is in controversy," and so, *sua sponte*, the trial court ordered Mother to undergo a psychiatric evaluation pursuant to Rule 35 of the Tennessee Rules of Civil Procedure "within 30 days of June 7, 2010."  *Id*. The order stated: "The Court requests that the evaluation be completed and a report prepared thereon prior to

---

[1] The trial court entered an order sealing the entire record in this case. For this reason, we refer to the parties by initials only.

the hearing on Father's petition." *Id*.  The trial court set Father's contempt petition for full hearing on July 2, 2010.  *Id*.

On July 2, 2010, the trial court conducted the hearing as scheduled. *S.A.M.D.* **I**, 2012 WL 5266194 at *2.  On July 15, 2010, the trial court entered a detailed order on Father's June Contempt Petition, which states, in relevant part:

> The Court has found Mother in criminal contempt and sentenced her to a total of 50 days in jail.  Based on the fact that Mother allowed Father to exercise eleven additional days of parenting time in the month of June 2010, following the filing of Father's petition, the Court will suspend Mother's sentence.  However, if Mother violates any order of the Court in the future, she will have to serve the sentence imposed on her by this order.

The July 15, 2010 order also further delineated the parties' parenting rights and obligations.  *S.A.M.D.* **I**, 2012 WL 5266194 at *2. Specifically, the order permitted Father to have parenting time for half of the child's summer vacation in 2010 and 2011, with proper notice to Mother, and specified that the child could travel with Father during his parenting time, including trips out of the country.  *Id*. It found that Mother had "interfered with Father's ability to communicate with the child by telephone." *Id*. For this reason, the trial court ordered that Father "shall be allowed to speak with the child by telephone daily," without Mother present in the room during the call. *Id*.  Mother was admonished not to coach the child. *Id.*  The order enjoined both parties from sending text messages or making telephone calls to the other after 9:30 p.m. Central Standard Time, except if there was an emergency concerning the child. *Id.*

The July 15, 2010 order noted that Mother had provided documentation showing that she had undergone the psychiatric evaluation ordered on June 18, 2010.  *S.A.M.D.* **I**, 2012 WL 5266194 at *3.  It stated that Mother had indicated that a report of the evaluation would be completed within a week of the hearing. *Id*.  In light of this, the hearing on the results of Mother's psychiatric evaluation was reset to allow Mother time to obtain and produce a copy of the report. *Id*. (footnote omitted).  Furthermore, in the July 15, 2010 order, the trial court noted that Son was in need of speech therapy, and it found that the two days per week that the child attended such therapy at school was insufficient. *Id*.  The trial court ordered the parties to "cooperate in scheduling speech therapy for the child" and to "promptly report to the trial court on the status of the speech therapy." *Id*. (footnote omitted).   Finally, Mother was ordered to pay $2,000 of the attorney fees Father incurred in connection with his June Contempt Petition to be paid "at a rate of $200 per month, commencing August 2, 2010, and due on or before the second day of each month thereafter." *Id*.

On September 22, 2010, Father filed another contempt petition ("September Contempt Petition"), alleging that Mother had continued to disregard the trial court's orders. *S.A.M.D.* **I**, 2012 WL 5266194 at \*3. Father claimed that Mother had violated the trial court's orders by: (1) failing to cooperate in scheduling his summer parenting time; (2) interfering with his daily telephone access to the child on specified dates during the summer; (3) failing to provide him with a copy of the results of Mother's psychological evaluation; (4) failing to take the child to speech therapy and failing to communicate with Father regarding the speech therapy; and (5) failing to pay Father attorney fees as set out in the July 15, 2010 order. *Id*. Based on Mother's continued defiance of the trial court's orders, Father asked the trial court to lift the suspension on Mother's 50-day sentence, and to require Mother to serve that sentence as stated in the July 15, 2010 order. *Id*. Father asked the trial court to place Son in his primary care during Mother's incarceration. *Id*. Father's September Contempt Petition also included concerns regarding Son's safety and welfare while in Mother's care. *Id*. Father claimed that Mother had been leaving Son, then seven years old, in the care of her son from a previous relationship, who was 11 years old at the time. *Id*. He asked the trial court to enter an order requiring that Son be supervised by an adult until he turns 12 years old. *Id*. Father also requested an award of attorney fees incurred in filing the petition. *Id*.

On November 16, 2010, Father filed another pleading, amending and supplementing the September Contempt Petition ("Supplemental Contempt Petition"). *S.A.M.D.* **I**, 2012 WL 5266194 at \*3. This pleading recounted more incidents in which Mother had allegedly refused to cooperate in scheduling Father's parenting time and had used the child to harass Father. *Id*. For example, Father alleged that Mother used Son to call Father at 12:54 a.m. while Father was working at an out-of-town event with a very early start time the next morning. *Id*. Father's Supplemental Contempt Petition noted that there was no emergency pertaining to the child and asserted that the purpose of the call was simply to harass Father. *Id*. The Supplemental Contempt Petition included other concerns about Mother's care of Son. *Id*. It alleged that during the 2010–2011 school year, Son had been tardy to school ten times, had been absent four days, and had missed portions of three additional school days. *Id*. All of this, Father argued, demonstrated that Mother was both disregarding the orders of the trial court and failing to meet her responsibilities to the child. *Id*.

On December 16 and 17, 2010, the trial court conducted an evidentiary hearing on Father's September and Supplemental Contempt Petitions. *S.A.M.D.* **I**, 2012 WL 5266194 at \*4. At the hearing, Father admitted that Mother had recently gotten into compliance with the trial court's orders, but asserted that she refused to do so until he filed his contempt petitions. *Id*. For this reason, Father insisted that Mother was guilty of criminal contempt. *Id*.

On December 17, 2010, the trial court issued an oral ruling on the pending matters.

-4-

*S.A.M.D.* **I**, 2012 WL 5266194 at \*8. It first found that Mother was again in criminal contempt of court for violating the trial court's orders. *Id*. On the issues related to contempt, the trial court credited Father's testimony and concluded that Mother's defiance of the court's prior orders was willful. *Id*. Contrary to Mother's explanations of her behavior, the trial court found that Mother did not merely "slip" on some of her obligations: "She didn't comply with any of [her obligations] in that order. There was compliance after the petition was filed and when she was facing jail. And that is [Mother's] MO. She only complies when she has to." *Id*. Consequently, the trial court partially lifted the suspension of the 50-day jail sentence for Mother meted out in the July 15, 2010 order, and it ordered Mother to serve three days in jail beginning that afternoon. *Id*.

The trial court next addressed the larger issue of the designation of Son's primary residential parent. It found that a substantial and material change in circumstances had occurred, and that designating Father as Son's primary residential parent was in the child's best interest. *S.A.M.D.* **I**, 2012 WL 5266194 at \*8. The trial court explained its original decision to designate Mother as Son's primary residential parent: "This Court did not want to take this 7-year-old and put him in the custody of a father who travels the world regularly." *Id*. However, after hearing the proof, the trial court concluded that Mother's failure to cooperate with Father, her failure to follow the trial court's orders, and her failure to adequately parent the child demonstrated that the change in designation of the primary residential parent was in the best interest of the child. *Id*. On the same day, the trial court entered a preliminary written order incorporating its oral ruling by reference, designating Father as Son's primary residential parent and awarding Mother liberal alternate parenting time to be agreed upon by the parties. *Id*.

On January 18, 2011, the trial court issued a comprehensive order on both of Father's contempt petitions. *S.A.M.D.* **I**, 2012 WL 5266194 at \*8. The order states, in pertinent part, that:

> The Court finds that Mother has violated the orders of the Court and that, pursuant to the terms of this Court's July 15, 2010 Order, the suspension of the sentence previously imposed on Mother should be lifted. However, the Court declines to lift the suspension of the entire sentence and declines to sentence Mother to further jail time for her subsequent violations of the Court's orders, which the Court finds total twenty to thirty counts. Rather, the Court orders that Mother shall serve three days in the Shelby County jail, commencing December 17, 2010.

The order set forth the factual findings underlying the trial court's conclusion that Mother was in criminal contempt of its prior orders. *Id*. The trial court found that Mother had: (1) failed to transport the child to school in a timely manner; (2) failed to timely secure speech therapy for the child; (3) failed to allow Father to exercise parenting time for half of the remaining part of the summer of 2010; (4) sent Father harassing text messages; (5) telephoned Father after hours for non-emergency reasons on September 20, 2010; (6) interfered with Father's telephone communication with Son; (7) failed to provide Father with a report of her psychiatric evaluation in a timely manner; and (8) failed to pay Father's attorney fees in the manner described in the order. *Id*. Although the order required Mother to serve three days of her 50-day suspended sentence, by the time the written order was entered, that sentence had been served. *Id*.

The order also addressed the change in the designation of primary residential parent. *S.A.M.D.* **I**, 2012 WL 5266194 at *8. The order found that there had been a substantial and material change in circumstances, and that those changes necessitated a change in the designation of the child's primary residential parent to Father. *Id*. The material changes listed in the order included Mother's interference with Father's relationship with the child, Mother's failure to get the child to school on time, and Mother's failure to secure speech therapy for the child in a timely manner following the trial court's June 18 and July 15 orders. *Id*. The order stated: "Mother has not lived up to her responsibilities as a parent," that she "has failed to place the child's best interests first," and that "there has been a total failure in parenting by Mother." *Id*. These same findings were the basis for the trial court's ruling that the child's best interest would be served by designating Father as the primary residential parent. *Id*. Finally, the order required Mother to pay Father $10,000 in partial payment of the attorney fees Father incurred in filing the contempt petitions. *Id*.

On February 17, 2011, Mother filed a motion to alter or amend or for a new trial pursuant to Rule 59.04 or Rule 59.02 of the Tennessee Rules of Civil Procedure. Mother argued in the motion that the trial court erred in finding that Mother had willfully interfered with Father's summer parenting time, and in finding that she willfully failed to obtain speech therapy for Son in a timely fashion. *S.A.M.D.* **I**, 2012 WL 5266194 at *8. She contended that there had been no material change in circumstances warranting the designation of Father as Son's primary residential parent. *Id*. On February 28, 2011, Mother filed an amended motion to alter or amend. She submitted new evidence showing that Mother had scheduled a speech therapy appointment for Son as early as July 21, 2010. *Id*. Mother also asserted that Son's circumstances had deteriorated since Father was designated the child's primary residential parent. *Id*. Specifically, Mother alleged that Father had enrolled the child in an unaccredited homeschool program, that he did not send the child's school books to Mother during her parenting time, and that the environment that Father and his girlfriend provided the child was a cause of concern for Mother. *Id*. In a separate motion, Mother asked the trial

court to stay execution of the January 18, 2011 order pending resolution of her post-trial motions. *Id*.

On March 29, 2011, the trial court held a hearing on Mother's motion to alter or amend or for a new trial. *S.A.M.D.* **I**, 2012 WL 5266194 at \*8. At the hearing, the trial court indicated that the allegations by Mother that involved post-judgment facts were not an appropriate basis for altering its previous decision, but that they would be relevant to a new change in circumstances, going forward. *Id*. Thus, the trial court declined to alter or amend its previous ruling. *Id*. On April 25, 2011, the trial court entered an order denying Mother's motion to alter or amend or for a new trial. *Id*. Mother appealed this order in *S.A.M.D.* **I**. Therein, this Court affirmed both the findings of contempt against Mother and also affirmed the trial court's designation of Father as primary residential parent. On June 19, 2011, the Tennessee Supreme Court denied Mother's application for permission to appeal this Court's ruling in *S.A.M.D.* **I**. Thereafter, on July 14, 2011, Mother filed a petition in the trial court to change custody from Father back to her, for civil and criminal contempt, and for attorney's fees against Father. This petition (and Father's counter-petition, discussed below) give rise to the instant appeal. In support of her petition to change primary residential custody, Mother's petition alleged a material change in circumstances based upon the following factual averments: (1) although Son had been "performing well" at his private school, Father had enrolled Son in an "unaccredited home school program;" (2) Father had failed to return the child's school books when the child went to Mother's for visitation, thus precluding Mother from helping Son with his studies; (3) Father sent harassing text messages to Mother in violation of the court's orders; (4) Father delayed seeking medical attention for the child's ear infection, and then administered medication to which the child was allergic; (5) Father made publically defamatory statements against Mother.

On December 2, 2011, Father filed a response to Mother's petition, denying the material allegations contained therein. Concurrent with his response, Father filed a counter-petition for civil and criminal contempt and attorney's fees against Mother. In his counter-petition, Father alleged that Mother was in contempt of court based upon the following factual averments: (1) although Father alleged that he provided Mother with all information necessary to access the on-line components of Son's home schooling program and speech therapy, Mother had consistently failed and refused to ensure that the child completed his homework and speech therapy during her visitation time (Father's counter-petition specified ten incidents where Mother allegedly failed to ensure completion of the child's school work and speech therapy); (2) Mother had made harassing phone calls and had sent harassing text messages (Father's counter-petition specified seventeen incidents where Mother allegedly harassed Father *via* text message or phone); (3) Mother had not been attentive to the child's medical needs in that she had failed to ensure that the child was properly immunized, and had also failed to ensure that the child received regular dental visits; (5) Mother had failed to pay

Father's attorney fees as previously ordered by the court; (6) Mother had failed to cooperate with the child's transportation (Father's counter-petition specified three incidents where the Mother failed to ensure transportation for Son); (7) Mother had failed to consult with Father regarding decisions concerning the child; (8) Mother had made disparaging comments about Father in the child's presence; (9) Mother had interfered with Father's telephone time with the child.

On January 11, 12, and 17, 2012, the trial court heard Mother's petition and Father's counter-petition. Following the hearing, the trial court orally ruled that: (1) there had not been a material change in circumstances so as to necessitate a change in primary residential custody from Father to Mother; (2) Mother had failed to prove that Father was in contempt of court; (3) Father had proved that Mother was in contempt of court on several grounds (as discussed *infra*); (4) Father's child support obligation should be reduced from $3,000 per month to $100 per each day of Mother's parenting time; and (5) Mother was ordered to pay Father's attorney fees in the amount of $15,000. The trial court's judgment was reduced to an order, which was entered on June 4, 2012. Concerning the finding of contempt and Mother's punishment for the acts of contempt, the order states, in relevant part:

> 3. The Court finds that Mother has demonstrated a continued and perpetual disregard for the orders of the Court, to the detriment of the child. The Court does not find Mother's explanations of her behavior credible. . . .
>
> *                    *                    *
>
> The Court finds that Mother has violated the orders of the Court and that, pursuant to the terms of this Court's July 15, 2010 Order and January 18, 2011 [Order], the suspension of the remaining 47 days of the sentence previously imposed on Mother should be lifted. In addition, the Court finds that Mother has been guilty of an additional 75 counts [of contempt], but elects to sentence Mother for only one-half of that amount or 37 counts of criminal contempt. The Court sentences Mother for ten days for each count for a total of 370 additional days.
>
> Mother shall be sentenced as follows: (1) Mother shall serve thirty consecutive days in the Shelby County jail; and (2) thereafter, Mother shall serve 52 days, on twenty six consecutive weekends. The balance of Mother's sentence, 335 days, shall be suspended. However, if Mother violates any order of the Court in the future, she will have to serve the full sentence imposed on

-8-

her by this order.

Concurrent with the entry of its order, the trial court also entered an amended Permanent Parenting Plan.

Before the foregoing order was entered, on January 19, 2012, Mother filed an emergency motion for bond or release on her own recognizance. On January 29, 2012, the trial court entered an order granting Mother's motion. After entry of the June 4, 2012 order, on July 3, 2012, Mother filed a Tennessee Rule of Civil Procedure 59 motion to alter or amend the judgment, alleging, *inter alia*, that: (1) there was insufficient evidence to support the trial court's finding of contempt on the part of Mother; (2) the trial court erred in modifying Father's child support obligation when he had not filed a petition to modify, nor proferred any evidence of his earnings; and (3) the trial court lacked subject matter jurisdiction to modify the January 18, 2011 order concerning attorney fees. On November 1, 2012, Mother filed a supplement to her Rule 59 motion, which added a double jeopardy argument and an argument concerning due process. Father responded to Mother's Rule 59 motion, denying the material allegations contained therein. By order of December 4, 2012, the trial court denied Mother's Rule 59 motion in its entirety.

Mother appeals. She raises sixteen issues in her brief, which we restate and condense into the following seven issues:

> I. Whether the trial court erred in finding Mother in criminal contempt regarding:
>
> A. The child's school work;
> B. The child's school books;
> C. Mother taking the child to speech therapy and counseling;
> D. Father's telephone contact with the child; and
> E. Mother's failure to maintain life insurance. Mother also asserts that the trial court's consideration of her failure to obtain life insurance was a violation of Mother's due process.
>
> II. Whether the trial court imposed an excessive sentence upon Mother for her contempt?
>
> III. Whether the trial court erred in modifying Father's child support obligation?
>
> IV. Whether the trial court lacked subject matter jurisdiction to

amend the January 18, 2011 Order regarding payment of attorney fees? Whether the award of attorney fees in the June 4, 2012 order was erroneous.

V. Whether the trial court lacked subject matter jurisdiction to enter a protective order for subpoenas issued and served in Mississippi?

VI. Whether the trial court erred in admitting certain public records through the testimony of Anna Cladakis?

VII. Whether the trial court erred in admitting the opinion testimony of Dr. Amy Beebe in both the field of educational assessment and speech therapy?

In the posture of Appellee, Father asks this Court to award his attorney fees and expenses incurred in defending this appeal.

## I. Criminal Contempt

Mother argues that the trial court erred in holding her in criminal contempt of court on the five counts listed above. We will first outline the legal standard on this issue, and then analyze Mother's arguments.

As discussed in Gibson's Suits in Chancery, the importance of the court's contempt authority cannot be understated:

> The power to punish for contempt is one of the most significant prerogatives of the Court of Justice. Upon its bold and prudent exercise depend the respect, the dignity, and efficiency of Courts as arbiters of human rights. The mandates of a Court . . . must in all cases be obeyed promptly, faithfully and without question or evasion. The party upon whom the order or command of the Court operates is not allowed to speculate upon the equity of the complaint, or the legality or regularity of the order, or decree, or of the writ issued thereon. His simple duty is to obey, and when he disobeys it is a duty the Court owes to itself and to the public to impose appropriate sanctions.

Gibson's Suits in Chancery, Eighth Ed., § 25.01 at 25–1; *see also **In re Lineweaver***, 343

-10-

S.W.3d 401, 413–14 (Tenn. Ct. App. 2010). Tennessee statutes governing the courts' contempt powers provide that Tennessee courts may "inflict punishments for contempts of court" in cases involving "[t]he willful disobedience or resistance of any . . . party . . . to any lawful writ, process, order, rule, decree, or command of such courts." Tenn. Code Ann. § 29-9-102(3) (2012). This statutory provision "enables the courts to maintain the integrity of their orders." *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth*., 249 S.W.3d 346, 354 (Tenn. 2008).[2]

A finding of criminal contempt must be based on the following four elements: (1) the order that was allegedly violated must be lawful; (2) the order must be clear, specific, and unambiguous, (3) the order must actually be disobeyed or otherwise resisted; and (4) the

---

[2] In the very recent case of *Baker v. State*, No. M2011-01381-SC-R11-PC, ---- S.W.3d -----, 2013 WL 4768309 (Tenn. Sept. 6, 2013), our Supreme Court explained:

> The power of courts to punish contempts can be traced back to twelfth century English common law and was incorporated into American common law by the colonists. *See* Ronald L. Goldfarb, *The Contempt Power* 9, 19 (1963). The inherent power of courts to punish contemptuous conduct has long been regarded as essential to the protection and existence of the courts. *State v. Galloway*, 45 Tenn. 326, 331 (1868).

>> The power of courts to punish for contempt is of immemorial antiquity, and is inherent in all courts as a necessary power belonging to them in order to enable them to accomplish the purposes for which they were designed; that is, the orderly trial and decision of causes, the enforcement of public order, the prevention of interferences with their proceedings, and the enforcement of the due respect belonging to them as institutions of the country.

> *Graham v. Williamson*, 128 Tenn. 720, 164 S.W. 781, 782 (1914).

> However, at common law, the power of courts to punish contempts was vast and undefined, and with such unlimited and undefined discretionary power came the potential for abuse. Accordingly, in 1831, the Tennessee General Assembly enacted legislation to curb the contempt power of state judges. *See* Act of Dec. 19, 1831, ch. 19, 1831 Tenn. Pub. Acts 34; *see also* *State v. Beeler*, 387 S.W.3d 511, 519 (Tenn. 2012). The contempt power of Tennessee courts remains circumscribed by statute. Tennessee Code Annotated [S]ection 29-9-102. . . .

*Baker,* 2013 WL 4768309, at *4.

violation of the order must be willful. **Konvalinka**, 249 S.W.3d, at 354–55. A person accused of criminal contempt is presumed innocent, and the four elements must be proven beyond a reasonable doubt. **Cottingham v. Cottingham**, 193 S.W.3d 531, 538 (Tenn. 2006); **Black v. Blount**, 938 S.W.2d 394, 399 (Tenn. 1996).

Once a guilty verdict is entered, the contemnor's presumption of innocence is removed and is replaced by a presumption of guilt. *See* **Cottingham**, 193 S.W.3d at 538. Therefore, when the sufficiency of the evidence to support a criminal contempt finding is challenged on appeal, the defendant bears the burden of demonstrating why the evidence is insufficient to support the guilty verdict. *Id.* In conducting our appellate review, "the prosecution is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from it." *Id*. Additionally, "[q]uestions regarding the credibility of witnesses, the weight and value of the evidence, and any factual issues raised by the evidence are resolved by the trier of fact." *Id*. Thus, "this court must review the record to determine if the evidence in the record supports the finding of fact of guilt beyond a reasonable doubt, and 'if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt' we are to set aside the finding of guilt." **Eastman v. Eastman**, No. M2007-01797-COA-R3-CV, 2008 WL 2600695, at *2 (Tenn. Ct. App. June 30, 2008) (quoting Tenn. R. App. P. 13(e)). Stated another way:

> On appeal, individuals convicted of criminal contempt lose their presumption of innocence and must overcome the presumption of guilt. Therefore, "[a]ppellate courts do not review the evidence in a light favorable to the accused and will reverse criminal contempt convictions only when the evidence is insufficient to support the trier-of-fact's finding of contempt beyond a reasonable doubt." **Moody v. Hutchison**, 159 S.W.3d 15, 25 (Tenn. Ct. App. 2004). *See also* Tenn. R. App. P. 13(e); **Thigpen v. Thigpen**, 874 S.W.2d 51, 53 (Tenn. Ct. App.1993). Appellate courts review a trial court's decision of whether to impose contempt sanctions using the more relaxed abuse of discretion standard of review. **Hawk v. Hawk**, 855 S.W.2d 573, 583 (Tenn. 1993); **Freeman v. Freeman**, 147 S.W.3d 234, 242 (Tenn. Ct. App. 2003).

**Wilkinson v. Wilkinson**, No. M2010-00026-COA-R3-CV, 2011 WL 5986405, at *4 (Tenn. Ct. App. Nov. 29, 2011) *(perm. app. denied* Tenn. April 11, 2012) (citing **Brooks v. Brooks**, No. M2007-00351-COA-R3-CV, 2009 WL 928283, at *8 (Tenn. Ct. App. April 6, 2009) (internal footnote omitted)).

Under the abuse of discretion standard, the trial court's decision "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." *Camp v. Camp*, No. W2010-01037-COA-R3-CV, 2011 WL 2567542, at *5 (Tenn. Ct. App. June 29, 2011) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). The abuse of discretion standard involves "a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal." *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citing *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009)). The standard "reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives." *Lee Medical, Inc.*, 312 S.W.3d at 524 (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App.1999)). Accordingly, appellate courts are not permitted to "second guess" the trial court's determinations or to substitute their judgment for that of the trial court. *Lee Medical, Inc.*, 312 S.W.3d at 524 (citing *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App.1999)). "The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny." *Lee Medical, Inc.*, 312 S.W.3d at 524 (citing *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002)).

To summarize, in order to prevail on her criminal contempt issues, Mother bears the burden of overcoming the presumption of guilt. *Wilkinson*, 2011 WL 5986405, at *4. Accordingly, in reviewing the criminal contempt convictions in this case, we do not review the evidence in light most favorable to Mother, but will reverse the trial court's findings of contempt beyond a reasonable doubt only there is an abuse of discretion. It is Mother's burden to demonstrate that the relevant facts contained in the record are insufficient, as a matter of law, for a rationale trier of fact to find that she was guilty of the contempt citations beyond a reasonable doubt. Furthermore, as set out in full context above, the trial court made a specific finding that Mother was not a credible witness: "The Court does not find Mother's explanations of her behavior credible." Accordingly, any issues of credibility must be resolved in favor of Father: "On an issue which hinges on witness credibility, [the trial court] will not be reversed unless, other than the oral testimony of the witnesses, there is found in the record clear, concrete and convincing evidence to the contrary." *Tennessee Valley Kaolin v. Perry*, 526 S.W.2d 488, 290 (Tenn. Ct. App. 1974).

With the foregoing principles in mind, we turn to address the specific contempt findings that Mother appeals.

### A. School Work

Regarding its finding that Mother was guilty of criminal contempt relating to the child's school work, the trial court's June 4, 2012 order states, in pertinent part:

(A) Section I.J. (3) of the January 18, 2011 Permanent Parenting Plan [] provides in pertinent part as follows:

> Each of the parties will ensure that the child has completed his school work and/or homework during that parent's parenting time. . . [.]

The proof established that Mother had parenting time for 86 days during the 2011 calendar year and that the child completed 13 home schooling lessons during Mother's parenting time. Thus, Mother did not ensure that the child had completed any home schooling lessons on 73 days. Of the 73 days, Father testified that he did not send the books on the following periods: 03/29/11—04/03/11 (6 days); 05/06/11—05/09/11 (4 days); and 07/01/11—07/05/11 (5 days).

Thus, Mother failed to ensure that the child completed home schooling lessons on 58 days of her parenting time. Each day represents a separate count of contempt, of which the Court finds Mother guilty.

Turning to the record, the undisputed proof was that Son was enrolled in the A Beka home schooling program. Father testified that he sent Mother "all of the information relating to user names, passcodes and how to communicate with A Beka and how to retrieve from A Beka." During cross-examination, Mother was asked whether she was "aware that [the] Permanent Parenting Plan provide[d] that [Mother] ha[d] an obligation to ensure that your son complete[d] his schoolwork during your parenting time?" She answered "Yes." To this end, Mother hired Kelly Long, a teacher with what was then the Memphis City School system, to assist Son with his home schooling lessons.

The record indicates that Mother had eighty-six days of parenting time in 2011. According to Ms. Long, the child completed only thirteen lessons during Mother's visitation time. The A Beka curriculum requires one lesson per day. Accordingly, there were approximately seventy-three days when Mother had parenting time that she did not ensure that the child completed his lesson. However, Father did admit, as found by the trial court *supra*, that there were approximately fifteen days where his failure to tender the child's book precluded Mother from ensuring that his lessons were complete. However, the record clearly establishes that, for fifty-eight of her seventy-three days of parenting time, Mother (through no fault of Father) failed to see that the child's studies were completed.

According to the record, the home schooling curriculum continues throughout the

-14-

year and there is no "summer break;" however, when asked why she had not ensured that the child completed his lessons, Mother testified that she thought the child needed a break during the summer. In its January 17, 2012 statements from the bench, the trial court stated:

> Summertime. Lots of children go to summer school in the summertime, ma'am. Even the little ones if they have to be taught to catch up. Whether you call it working with a tutor all summer or whether you call it school.
>
> I mean, this is not hard school. This child finishes it one or two lessons a week even that. But instead, you said repeatedly on this stand, it's summertime. He shouldn't be in school. He should be playing with all the other kids.
>
> So you make it be a negative thing. You make [the child' hear all it's a negative thing . . . . And all the other kids are out playing but you['ve] got to work, so you're being punished and you're being punished by your father. All that negativity is soaked up by your child . . . .

From the record as a whole, and in light of the number of days (58) that Mother failed to ensure that the child completed his school work and her lack of any valid excuse, we conclude that there was sufficient evidence presented to support the trial court's finding that Mother was guilty, beyond a reasonable doubt, of fifty-eight counts of criminal contempt in willfully failing to ensure that the child completed his school work. Accordingly, the trial court did not abuse its discretion in this finding.

### B. School Books

The trial court's June 4, 2012 order states, in relevant part:

> Section I.J.(3) of the January 18, 2011 Permanent Parenting Plan, further provides in pertinent part as follows:
>
> > At the end of Mother's parenting time, Mother shall return to Father any and all of the child's school work, books and materials.
>
> The Court finds that following Mother's parenting time from February 19, 2011 to March 1, 2011, Mother failed to return one of the child's school books. As a result, Father paid $10.75 to replace the book. Exhibit 35. Mother's failure to return the

-15-

book is a direct violation of the above-quoted provision in the Permanent Parenting Plan.

Father's undisputed testimony indicates that, following her parenting time from February 19 to March 1, 2011, Mother failed to return one of the child's books. Father provided a receipt (Trial Exhibit 35) that he had paid for a replacement book.

From the record, we cannot conclude that there was insufficient proof to support the trial court's finding that Mother was guilty of criminal contempt, beyond a reasonable doubt, for failure to return the child's school book. Accordingly, the trial court did not abuse its discretion in so finding.

## C. Speech Therapy and Counseling

Mother was found in criminal contempt both for her failure to ensure that the child attended his scheduled speech therapy sessions, and also for failure to consult with Father regarding a change in the child's speech therapist and counseling for the child.

Concerning Mother's failure to ensure that the child attended his speech therapy, the trial court's June 4, 2012 order states, in relevant part, that:

> Section I.J.(3) of the January 18, 2011 Permanent Parenting Plan, also provides in pertinent part as follows:
>
>> [ ] In addition, each parent shall ensure that the child participates in speech therapy as scheduled.
>
> Mother has failed to ensure that the child has participated in speech therapy during her parenting time. The records from Tiny Eye Speech Therapy reflect that the speech therapist was "unable to schedule speech therapy. [Son] @ his mother's house in Memphis" on the following dates: 3/29/11, 6/5/11, 7/1/11, 8/29/11, 9/5/11. In addition, the . . .[s]peech therapy records reflect that on 4/1/11, "BILL FOR NO SHOW. [Son] was with mom . . . this week. I have had to reschedule multiple sessions with [Mother] due to no-shows. I was unable to reschedule this session as it was on a Friday and [Son] is not with [Mother] next week." [This information was admitted as part of Trial Exhibit 15].
>> Mother's failure to ensure that the child participated in

speech therapy, as outlined herein, represents seven additional counts of contempt.

The foregoing findings are supported by sufficient evidence in the record. Accordingly, we cannot conclude that the trial court erred in finding that Mother was guilty, beyond a reasonable doubt, of criminal contempt in failing to ensure that the child participated in scheduled speech therapy during her parenting time. The record supports a finding that Mother's was guilty of contempt in this regard on the occasions outlined in the trial court's findings, *supra*. Accordingly, we cannot conclude that the trial court abused its discretion in finding seven counts of contempt for failure to ensure participation in speech therapy.

Concerning Mother's unilateral decision to take the child to a different speech therapist and to have him participate in counseling, the June 4, 2012 order states, in relevant part:

> The decision making provisions of the January 18, 2011 Permanent Parenting Plan provide that the parties must confer with one another in good faith concerning major decisions for the child and, in the event the parties cannot agree, they shall participate in mediation as required by Section V of this plan. Mother has willfully failed and refused to consult with Father as required by the plan by taking the child to Janna Hacker, a speech therapist, on two separate occasions after she was aware that the child was participating in speech therapy through the Tiny Eye program, without consultation with or the agreement of Father. Mother further willfully failed and refused to consult with Father prior to taking the child to see Andrea Nichols, a psychologist. The Court finds that Mother's actions in taking the child to a psychologist were not justified by any legitimate risk or threat of harm to the child. The Court finds Mother guilty of three additional counts of contempt for the violations outlined in this subsection.

Turning to the record, Mother admitted that she took the child to see speech therapist Jenna Hacker:

> Q [to Mother]: With respect to speech therapy, you did not consult with [Father] before you began taking [the child] to Janna Hacker again; is that correct?

A. I did what the Judge said. I got him as much speech therapy as possible.

Q. That wasn't my question. You didn't consult with [Father] when you began taking [Son] to Janna Hacker after the December 17th ruling of the Court, did you?

A. I think I did tell him we were going there. I told him we were going there. I told him we were doing all of–I said we're doing all three [i.e., the speech therapy that Father knew about, the speech therapy with Ms. Hacker, and counseling with Andrea Nichols].

Concerning the child's visits with Ms. Nichols, Mother admitted that Father did not learn that she had taken the child to see the psychologist until Mother filed her Rule 59 motion to alter or amend the trial court's judgment, *supra*:

Q [to Mother]. And, in fact, [Father] did not learn that you had taken the child to see this psychologist until you attached notes from her or a letter from her to the Motion to Alter or Amend that you filed in this Court; isn't that true?

A. That's true . . . [.]

Mother's testimony that she consulted with Father prior to taking the child to Janna Hacker was unsupported by any evidence, e.g., text messages, phone records. Furthermore, Mother's testimony was disputed by Father, who stated that Mother did not, as she claims, consult with him prior to enrolling the child with Ms. Hacker, or prior to taking the child to counseling. Specifically, Father testified that he did not know that the child had seen either Ms. Hacker or Ms. Nichols until he received their billings. As noted above, in this case, the trial court made a specific finding that Mother was not a credible witness. Accordingly, in the case of conflicting testimony, and in the absence of any non-parol evidence or other evidence that calls into question Father's credibility, the testimony of the Father must be credited: "On an issue which hinges on witness credibility, [the trial court] will not be reversed unless, other than the oral testimony of the witnesses, there is found in the record clear, concrete and convincing evidence to the contrary." *Tennessee Valley Kaolin v. Perry*, 526 S.W.2d 488, 290 (Tenn. Ct. App. 1974).

From the entire record, we conclude that there was sufficient evidence from which the trial court could conclude that Mother was in criminal contempt, beyond a reasonable doubt,

-18-

based upon both her failure to ensure that the child attended his scheduled speech therapy sessions, and also for taking the child to another speech therapist and to a psychologist without first consulting with Father as required by the Parenting Plan. Accordingly, we conclude that the trial court did not abuse its discretion in charging Mother with ten additional counts of criminal contempt for these actions.

### D. Telephone Contact

In its June 4, 2012 Order, the trial court states:

> The Court's July 15, 2010 Order provides in Paragraph 8 as follows:
>
>> The Court finds that Mother has interfered with Father's ability to communicate with the child by telephone. Father shall be allowed to speak with the child by telephone daily. Mother shall not be in the room with the child when he is speaking to Father. If there is any clear indication that the child is being coached by Mother as to what he should say during his conversations with Father, whether or not she is in the room during those conversations, the Court will take further action.
>
> Mother has been ordered not to interfere with Father's telephone contact during her parenting time. In spite of this, the proof has shown that Father has had continued difficulty reaching the child by telephone when he is with Mother. The dates on which this occurred include January 27, February 3, and February 28. The Court finds that each date represents a separate count of contempt for which the Court finds Mother guilty.

Turning to the record, Father testified that he had difficulty, on many occasions, trying to speak with the child by telephone. On January 27, 2011, Father's attorney sent a letter to Mother's attorney in an effort to resolve the telephone contact issues. This did not resolve the problems and, on February 3, 2011, Father sent an email to Mother, expressing his concern at not being able to speak to the child. When the problem persisted, Father's attorney sent another letter to Mother's attorney on February 28, 2011, which appears to have also been of no avail. The record indicates that, when Father called to speak with Son, Mother would often initiate discussions on other subjects. Although Mother asserts, in her

brief, that the trial court's orders do not require her to put the child on the phone "immediately or within hours or minutes of [Father] calling or otherwise," this argument is spurious at best. Furthermore, from the trial court's order, it does not appear that Mother was held in contempt based upon the timing of any of the child's return calls to Father. Rather, she was held in contempt for those instances where Father was not allowed to speak to the child at all.

From the record as a whole, we conclude that there is sufficient proof to support the trial court's finding that Mother was in criminal contempt, beyond a reasonable doubt, for failure to allow the child telephone contact with Father.

### E. Life Insurance

It is well settled that a court speaks through its orders. *Palmer v. Palmer*, 562 S.W.2d 833, 837 (Tenn. Ct. App.1977). Concerning life insurance, the trial court's June 4, 2012 order states:

> The Court finds that Mother has failed to secure or maintain life insurance required of her pursuant to the Permanent Parenting Plan. The Court is not sentencing Mother to jail based on this violation, as it was not alleged in Father's Petition.

Despite Mother's argument that the trial court erred in finding her in criminal contempt for failure to maintain life insurance, the foregoing language indicates that the trial court did not, in fact, base any findings of contempt on her failure to procure life insurance.

Concerning an alleged violation of her right to due process, Mother argues, in her brief that:

> In *Turner v. Rodgers* . . . the United States Supreme Court held that notice [of] ability to pay is required prior to proceeding to any issue of contempt regarding payments. The proponent of civil contempt charges must provide specific notice that ability to pay would be a critical issue in the contempt trial and there must be express findings in the record of ability to pay. *Id*. The same requirement should be extended to criminal contempt charges and retroactively applied. *Davis v. US*. . . [.]
> Here, this notice was not presented in the petition and the Court should not have ruled upon it.

-20-

Again, as noted above, Mother's failure to provide life insurance did not form the basis for any of the findings of contempt. Accordingly, we need not reach the question of whether notice was given, nor do we need to reach the question of whether there was sufficient evidence in the record to support such finding on the ground of failure to maintain life insurance. Even if we assume, *arguendo*, that the trial court erred in considering the issue of life insurance, this would be harmless error based upon the fact that the trial court did not base any of the contempt charges on the life insurance question. Accordingly, the trial court's consideration of Mother's failure to provide life insurance does not constitute reversible error. Tenn. R. App. P. 36(b) ("Effect of Error. A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process . . . .").

## II. Excessive Sentence

In its June 4, 2012 order, the trial court states, in relevant part:

By order entered July 15, 2010, the Court stated as follows:

The Court has found Mother in criminal contempt and sentenced her to a total of 50 days in jail. Based on the fact that Mother allowed Father to exercise eleven additional days of parenting time in the month of June 2010, following the filing of Father's petition, the Court will suspend Mother's sentence. However, if Mother violates any order of the Court in the future, she will have to serve the sentence imposed on her by this order.

By order entered January 18, 2011, the Court stated as follows:

The Court finds that Mother has violated the orders of the Court and that, pursuant to the terms of this Court's July 15, 2010 Order, the suspension of the sentence previously imposed on Mother should be lifted. However, the Court declines to lift the suspension of the entire sentence and declines to sentence Mother to additional jail time for her subsequent violations of the Court's orders, which the Court finds total

-21-

twenty to thirty counts. Rather, the Court orders that Mother shall serve three days in the Shelby County jail, commencing December 17, 2010.

The Court finds that Mother has violated the order of the Court and that, pursuant to the terms of this Court's July 15, 2010 Order and January 18, 2011 [Order], the suspension of the remaining 47 days of the sentence previously imposed on Mother should be lifted. In addition, the Court finds that Mother has been guilty of an additional 75 counts, but elects to sentence Mother for only one-half of that amount or 37 counts of criminal contempt. The Court sentences Mother for ten days for each count for a total of 370 additional days.

Mother shall be sentenced as follows: (1) Mother shall serve thirty consecutive days in the Shelby County jail; and (2) thereafter, Mother shall serve 52 days, on twenty six consecutive weekends. The balance of Mother's sentence, 335 days, shall be suspended. . . .

As discussed in the recent case of **Baker v. Baker**, M2010–01806–COA–R3–CV, 2012 WL 764918 (Tenn. Ct. App. March 9, 2012):

As we begin our analysis of the sentence imposed it is important to recognize that criminal contempt is used to "preserve the power and vindicate the dignity and authority of the law" as well as to preserve the court "as an organ of society." **Black v. Blount**, 938 S.W.2d 394, 398 (Tenn.1996); *see also* **Thigpen v. Thigpen**, 874 S.W.2d 51, 53 (Tenn. Ct. App.1993). Criminal contempt proceedings "'in a very true sense raise an issue between the public and the accused.'" **Id**. Conversely, criminal contempt is not to be used to benefit the contemnor's adversary in a civil proceeding; that is the purpose and function of civil contempt. **Overnite Transp. Co. v. Teamsters Local Union No. 480**, 172 S.W.3d 507, 510 (Tenn. 2005)(stating that a civil contempt action is generally brought to enforce private rights).

**Id**. at *11.

The Tennessee Supreme Court has described criminal contempt proceedings as *sui generis*[, i.e., a class unto itself]—neither a civil nor a criminal prosecution as ordinarily

understood, not a criminal prosecution within the Sixth Amendment of the United States Constitution." ***Bowdon v. Bowdon***, 278 S.W.2d 670, 672 (Tenn. 1955). As noted by this Court in the recent case of ***Coffey v. Coffey***, No. E2012-00143-COA-R3-CV, 2013 WL 1279410 (Tenn. Ct. App. March 28, 2013):

> Unlike a typical criminal prosecution, which stands or falls on its own set of circumstances, a criminal contempt proceeding is necessarily based on a preexisting court order and is an offense against the court itself. *See **Doe v. Board of Professional Responsibility of the Supreme Court of Tennessee***, 104 S.W.3d 465, 474 (Tenn.2003) (contempt proceeding is sui generis and is incidental to the case from which it arises). . . .
>
> Criminal contempt statutes are not like other criminal statutes that prohibit certain activities, such as driving without a license or selling alcohol to a minor. Rather, they are "punitive in character, and their primary purpose is to vindicate the court's authority." [***Thigpen v. Thigpen***, 874 S.W.2d 51, 53 (Tenn. Ct. App. 1993] ( citing ***Gunn v. Souther[n] Bell Tel. & Tel. Co.***, 201 Tenn. 38, 296 S.W.2d 843, 844 (1956) and ***Garrett v. Forest Lawn Memorial Gardens***, 588 S.W.2d 309, 315 (Tenn. Ct. App.1979)); *see **Long***, 221 S.W.3d at 12–13 (criminal contempt sanctions imposed simply as punishment).

***Id***. at *8.

In ***Sloan v. Poff***, No. M2009-01839-COA-R3-JV, 2011 WL 1166845, at *10 (Tenn. Ct. App. March 29, 2011), this Court addressed Appellant's question of whether Tennessee Code Annotated Section 40-25-303(c)(1) allowed the trial court to suspend Appellant's sentence for criminal contempt only "up to and including the statutory maximum time for the class of convicted offenses." ***Sloan***, 2011 WL 1166945, at *8. In ***Sloan***, Appellant specifically argued that because the "criminal contempt statute prevents a court from incarcerating an individual for more than ten days, *see* Tenn. Code Ann. §29-9-103, section 40-35-303(c)(1) precludes a court from suspending the sentence for longer than ten days because ten days is the 'statutory maximum time for the class of the convicted offense." ***Id.*** In ***Sloan***, this Court specifically rejected Appellant's argument, stating that:

> [Appellant's] argument would be persuasive if criminal contempt constituted a violation of the criminal law and if a suspension of a criminal contempt sentence constituted

-23-

"probation" as that term is used in Tenn. Code Ann. §40-35-303(c)(1). However, criminal contempt is not considered a violation of the criminal law, and a suspension of a criminal contempt sentence does not constitute probation. As a result, we conclude that the [trial court] did not err when it suspended [Appellant's] ten-day sentence . . . .

*Sloan*, 2011 WL 1166845 at *8. Relying upon this holding in *Sloan*, in *Coffey*, we specifically addressed the question of whether Tennessee Code Annotated Section 40-35-310(a) (2010) precluded the trial court from "unsuspending" a sentence for criminal contempt beyond the maximum term to which defendant could have been sentenced. *Id*. In affirming the trial court's decision to suspend Appellant's sentence in *Coffey*, we noted that:

> When the trial court found Mother in criminal contempt, it did not find Mother guilty of a crime. Rather, it found Mother had willfully violated its orders dated January 7, 2009 and July 30, 2009. We conclude Tennessee Code Annotated § 40-35-303(c)(1) does not come into play when criminal contempt is at issue and, therefore, it does not affect the court's ability to suspend its ten-day sentence imposed pursuant to Tenn. Code Ann. § 29-9-103.

*Coffey*, 2013 WL 1279410, at *8. The *Coffey* Court specifically noted that:

> It is not unusual for a court that has found an individual in criminal contempt for violating its order to suspend a sentence imposed as a sanction for that contempt. *See Cansler v. Cansler*, 2010 WL 342652, at *10 (Tenn. Ct. App. 2010) (holding § 29-9-103 does not mandate a sentence be imposed, and trial court can suspend any sentence it gives); *Thigpen*, 874 S.W.3d at 54 (trial court should have suspended all but one day of sentence imposed for criminal contempt).

*Coffey*, 2013 WL 1279410, at *8. Although *Sloan* and *Coffey* stand for the proposition that certain requirements of the Criminal Sentencing Reform Act of 1989 are not applicable to a trial court's decision of how to sentence for criminal contempt, in *State v. Wood*, 91 S.W.3d 769 (Tenn. Ct. App. 2002), this Court noted that:

> There is, however, a principle embodied in the criminal statutes that we think applies wherever punitive incarceration is

considered. Tenn. Code Ann. § 40-35-103(4) requires that the sentence be the least severe measure necessary to achieve the purpose for which the sentence is imposed. In this country, where freedom is highly valued and the fundamental laws (both state and federal) restrict the power of the government to infringe on that freedom, that principle should guide courts in the imposition of any prison sentence imposed for punishment. In the criminal law the courts exercise some control over punishment by subjecting sentencing statutes and orders of confinement to a proportionality test under the Eighth Amendment to the United States Constitution and Article I Section 16 of the Tennessee Constitution. *See* ***State v. Harris***, 844 S.W.2d 601 (Tenn. 1992). In contempt the courts have said that in order to safeguard constitutional procedures courts should employ "the least possible power adequate to the end proposed." ***In Re Michael***, 326 U.S. 224 at 227, 66 S.Ct. 78, 90 L.Ed. 30 (1945). Because the right to a trial by jury historically did not attach to a charge of contempt, *see* ***Ahern v. Ahern***, 15 S.W.3d 73 (Tenn. 2000) and ***Green v. United States***, 356 U.S. 165, 78 S.Ct. 632, 2 L.Ed.2d 672 (1958), appellate courts are charged with a special responsibility to see that the contempt power is not abused.

***State v. Wood***, 91 S.W.3d at 776.

In ***Baker v. Baker***, Judge Clement, writing for the Court, succinctly stated the applicable standard of review for questions involving the length of a sentence imposed for criminal contempt:

When the defendant is found guilty of criminal contempt, the trial court has the discretion to impose a sentence and to require that the defendant serve the sentence imposed or, alternatively, to place the contemnor on probation subject to reasonable terms and conditions. If the defendant was placed on probation and thereafter violates conditions of his or her probation, the trial court has the authority to revoke the suspension of the sentence and, among other alternatives, order the execution of the original sentence. ***State v. Beard***, 189 S.W.3d 730, 735 (Tenn. Crim. App. 2005). Alternatively, the court has "the discretionary authority upon the revocation of

probation to impose something less than the original sentence, depending upon the circumstances of the case. " *Id*. (citing *State v. Troy McLemore*, No. 03C01-9709-CC-00406, 1998 WL 422339 (Tenn .Crim. App. July 28, 1998); *State v. Marty Miller*, No. 03C01-9602-CC-00056, 1997 WL 90638 (Tenn. Crim. App. Mar. 4, 1997); *State v. Melvin Griffin*, No. 01C01-9503-CC-00090, 1995 WL 679112 (Tenn. Crim. App. Nov. 16, 1995)).

The determination of the appropriate consequence of such a violation embodies a separate exercise of discretion. *State v. McCoy*, No. M2011-00006-CCA-R3-CD, 2011 WL 6916227 (Tenn. Crim. App. Dec. 28, 2011) (citing *State v. Hunter*, 1 S.W.3d 643, 647 (Tenn.1999); *State v. Reams*, 265 S.W.3d 423, 430 (Tenn. Crim. App. 2007)).

*                              *                              *

The overall length of Mother's sentence must be "justly deserved in relation to the seriousness of the offense[s]," and "no greater than that deserved" under the circumstances," *In re Sneed*, 302 S.W.3d 825, 828 (Tenn. 2010), and if we determine that a sentence is excessive, it is incumbent upon this court to reduce or otherwise modify an excessive sentence for contempt. *See **Robinson v. Air Draulics Engineering Company**, 377 S.W.2d 908, (Tenn. 1964); **Barrowman v. State ex rel. Evans**, 381 S.W.2d 251, 253–54 (Tenn. 1964); **Thompson v. State**, 241 S.W.2d 404 (Tenn. 1951); **Metcalf v. Eastman**, 228 S.W.2d 490 (Tenn. 1950); *see also* **Hundhausen v. U.S. Marine Fire Ins. Co.**, 52 Tenn. 702 (Tenn. 1871) (wherein the court held that "if the punishment seems to be excessive this Court on appeal has jurisdiction to revise and reduce the sentence[]").

*Baker*, 2012 WL 764918, at \*10–\*12; *see also* **State v. Bise**, 380 S.W.3d 682 (Tenn. 2012) (adopting the abuse of discretion standard in place of the *de novo* standard of review as to the length of the sentence imposed).

In addition to the foregoing authority, the United States Supreme Court has also set out some of the factors that should be considered in reviewing a contempt sentence:

[T]he trial judge may properly take into consideration the extent of the willful and deliberate defiance of the court's order, the

-26-

seriousness of the consequences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future.

***United States v. United Mine Workers of America***, 330 U.S. 258 at 303, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

From the record, the trial court's reasoning concerning the sentence imposed for Mother's contempt is the result of the court's frustration with Mother's continued disregard for its orders. For example, the court states:

What has she complied with, anything? Not that I can find. So, I have no choice. What I have a choice in is how long she's going to jail . . . [.] But I don't have any choice. I'm not respecting this bench and the law of this state if I do not send this lady to jail. . . . I tried to make it easier for you and you refused to do it, so I have no choice. I'm not going to continue to punish [Father] because you refuse to follow the court's orders. It's as simple as that. I have no choice.

The court further states that, "[t]he bottom line is, you haven't followed any of this Court's orders . . . . I find, in fact, that there is a continuing circumstance of perpetual disregard for this Court's order[s] to the detriment of the minor child."

In addition, the court noted the fact that Mother showed a lack of respect for the court. When the court expressed concern about Mother's failure to recognize that the child should not be on Facebook, Mother reacted such that the court stated:

And [Mother] is rolling her eyes at me right now like she doesn't believe that that carries weight. All the more reason for me to question her ability to parent at all. . . .

From the record, we agree that Mother has engaged in a continuing pattern of disregard for the court's orders. Mother's conduct indicates that she believes that the court orders simply do not apply to her. This is exactly the type of behavior and thinking that punishment for contempt is designed to address. Despite its rightful frustration with Mother's continued disregard for its orders, the court in this case nonetheless showed her leniency:

> With regard to [Mother's] counts of contempt, it's alleged that you have 58 counts where you had failure to do education for [the child]. There was testimony that some of those, just a few, one or two times, the books were not sent.
>
> But I'm going to give you a break there. I'm going to divide that in two. And just assume that hopefully she was working on it and give her credit for the 29. But that leaves 29.

The court also showed Mother leniency concerning her interference with Father's telephone contact with Son:

> So what I'm going to do is, that's 20–22, that's 25 times when you could not reach, seven times when she was interrupting, 15 counts of contempt of telephone calls. I'm going to reduce that to one. . . .
>
> I've got—the argument was seven times that he could not reach her . . . .
>
> [Mother], I am finding you guilty of 37 counts of contempt and violation—contempt of violation of this prior court's order of December 2010. You, at this point, owe the court 47 days. . . .
>
> The total is 370 days from the 37 and 47—417 days, I'm not sentencing you to that, because I'm hoping this will make an impression on you. You are going to serve the 47 days, plus 37 days from today's contempt. So that would leave 390—390 days. You've got a year in jail hanging out there. And you're going to serve 30 days in the Shelby County jail. The balance will be served on the weekend, every weekend until the time is fulfilled. So you will have an additional 54 days to serve on the weekend.

As correctly noted by Father in his brief, from the date of the parties divorce in February 2012 through January 2013, the trial court has conducted three separate hearings on Father's contempt petitions against Mother. In each of those hearings, the trial court determined that Mother had violated the court's orders. Mother has been given leniency in the form of suspended sentences, but she has not availed herself of the opportunity to cure her contempt and to follow the orders of the court. Rather, as discussed in detail above, she

has continued to violate the court's orders and has, in fact, committed additional acts of contempt while operating under the largess of the court's suspended sentence. We agree with the trial court's comment that it has exhausted its options other than jail to motivate Mother to comply with its orders. Given Mother's excessive and continual violations of the trial court's orders over the relevant period of less than two years, we cannot conclude that the trial court imposed an excessive sentence in this case, or that it otherwise abused its discretion.

### III. Modification of Father's Child Support

In its June 4, 2012 order, the trial court states, in pertinent part:

> On June 4, Mother posted to her Facebook page, "oh my goodness . . . my body is so fit and firm . . . I just ate 2 sausage egg mayonnaise sandwiches from CKS! Ok and half a bacon egg and mayo . . . I am so happy . . . life is good . . . child support well spent."
>
> The Court finds that Father has continued to pay $3,000 per month as child support, in spite of the fact that he has been the child's primary residential parent since December 2010. Based on Mother's testimony, she earned $112,500 in the year 2010. The Court finds that Mother has an earning capacity which she is not attaining and that Father should not be required to support the entirety of Mother's household which includes Mother, her son from a previous relationship, and her sister's two children.
>
> Based on all the factors to be considered, the Court finds that $100 per day that Mother has parenting time is a reasonable amount of child support. As Mother has 86 days of parenting time in the year 2011, the Court hereby modifies Father's child support obligation to $717 per month, commencing January 17, 2012, and calculated as follows: $100 / day x 86 days / 12 months. It is contemplated that the child support may be adjusted on an annual basis, based on the number of days of parenting time exercised by Mother. This is an upward deviation from the Tennessee Child Support Guidelines. If Father's child support were calculated strictly in accordance with the Tennessee Child Support Guidelines, Father would not

pay child support directly to Mother in any amount.

On January 12, 2012, in making its initial decision to reduce Father's child support, the trial court stated:

> Well, [Mother] needs to get a job. The guidelines are the guidelines. I am not going to allow [Mother] to be enabled by [Father] paying child support to a lady who is living on child support. She may say that comment [on Facebook, *see supra*], a good expenditure of child support, was a joke. This Court doesn't take it as a joke.

The trial court went on to state:

> I want another Parenting Plan done. Child support stops from this day forward. Well, no, let me—let me think about his because the days the child is with her, I want a reasonable amount of child support to be paid, $50 per day. That will feed the child, that will clothe the child, and the mother has an equal responsibility with [Father] to provide for that child.
>
> So $50 a day right not times 86 days, and in the future it will be adjusted. [Father] does not have a responsibility to support [Mother] for her other children or the children who are in [her] custody. . . .

On January 17, 2012, the trial court modified this oral ruling, stating that it was ordering $100 per day as child support. At this point, counsel for Mother stated that Mother "would like an opportunity to review that issue and see if that's compliant with the statute as well." Father argues that Mother failed to preserve any objection to the issue of child support and, as such, the issue was tried by consent. While we concede that "[i]ssues not raised in the trial court cannot be raised for the first time on appeal," **Sparks v. Metro. Gov't of Nashville**, 771 S.W.2d 430, 434 (Tenn. Ct. App. 1989)(citing **Irvin v. Binkley**, 577 S.W.2d 677 (Tenn. Ct. App. 1978)), as set out above, Mother's attorney did, in fact, object to the child support ruling.

As stated in 19 W. Walton Garrett Tennessee Practice: Divorce, Alimony & Child Custody § 20:1 (2013):

> Tennessee retains jurisdiction in the trial court, by statute, for

the modification of future . . . child support . . . . The pleadings
and proof must show permanent change in the circumstances of
the parties since the last decree. . . .

Criteria for modification of child support include the
noncustodial parent's ability to provide for the child or children's
needs, the resources and needs of the custodial parent,
remarriage of a parent, conduct of the custodial spouse after
decree, provision of services in kind, and emancipation.

*Id*. (footnotes omitted). Although it is clear to this court that there has been a change in
circumstances in that the Father is now the child's primary residential parent, it is well settled
that "[a]ny order for child support shall be a judgment entitled to be enforced as any other
judgment of a court of this state, and . . . shall not be subject to modification as to any time
period or any amounts due prior to the date that an action for modification is filed and notice
of the action has been mailed to the last known address of the opposing parties." Tenn. Code
Ann. § 36-5-101(f)(1); **Brown v. Heggie**, 876 S.W.2d 98, 101 (Tenn. Ct. App. 1993).
Prospective modifications of child support are also subject to the notice requirement
contained in Tennessee Code Annotated Section 36-5-101(f)(1). *See* **State ex rel. Shaver v.
Shaver**, No. 01A01-9610-CV-00474, 1997 WL 401827 (Tenn. Ct. App. July 18, 1997)
(*perm. app. denied* Tenn. Dec. 29, 1997).

One of the reasons for the notice requirement is that the purpose of an action can only
be determined from the pleadings. **Pierce v. Tharp**, 461 S.W.2d 950, 953 (Tenn. 1970).
Although we have previously recognized that trial courts have the ability to treat any
pleading according to the type of relief sought, regardless of its title, **Estate of Doyle v.
Hunt**, 60 S.W.3d 838 (Tenn. Ct. App. 2001), even if we construe Father's petition as
liberally as possible, it simply does not constitute "an action for modification" of his child
support obligation. "A trial court has no authority, *sua sponte*, to modify its child support
decrees." **Long v. Long**, No. 01A01-9406-CV-00270, 1995 WL 33741 (Tenn. Ct. App. Jan.
27, 1995). In its December 4, 2012 order, denying Mother's motion to alter or amend the
June 4, 2012 order, the trial court explained its reasoning for addressing the issue of Father's
child support:

Mother challenges the Court's authority to modify child support.
The Court raised the issue of modification of child support *sua
sponte*, based on equitable principles. The Court found that
Mother is able-bodied, but was choosing not to work. The Court
found that it was unjust and inappropriate for Father to continue
to pay the same amount of child support that he paid prior to

-31-

being designated as the child's primary residential parent, as Mother was utilizing these funds to support her household, including her son from a prior relationship and her sister's two children.

The trial court's order also notes Mother's Facebook post, *supra*, in which she writes "child support well spent." Although the trial court's statements may be true, the problem with the trial court's ruling is that it was not precipitated by a petition for modification. Thus, Mother did not receive notice of any probability that child support was an issue at the hearing as required by statute. Tenn. Code Ann. § 36-5-10(f)(1). Accordingly, we must reverse the trial court's order concerning modification of Father's child support obligation. However, our holding does not preclude Father from filing a petition for modification of child support on remand should he choose to pursue such relief.

### IV. Attorney Fees

In its June 4, 2012 Order, the trial court states, in relevant part:

Paragraph 10 of the Court's January 18, 2011 Order provides as follows:

> Mother shall pay to Father the sum of $10,000 in partial payment of the attorney fees that [Father] has incurred incident to the filing and prosecution of his petition. Father shall be, and is hereby, awarded a judgment against Mother in said amount, which shall be paid no later than the date that Mother receives the next payment relating to the book that she has or is writing.

Following the entry of the January 18, 2011 Order, Mother filed a "Motion for Stay of Execution Pending Post Trial Motions" in which she sought to stay the Court's order, including the order requiring her to pay $10,000 toward Father's attorney fees. This Court ordered Mother to pay the sum due into her attorney's escrow account. As of January 17, 2012, Mother had not done so.

The Court's January 18, 2011 Order included the provision that this judgment would be paid no later than the date that Mother receives the next payment relating to the book that

she has or is writing based on Mother's testimony offered in December 2010 in which she testified that she expected to receive a substantial sum related to her book within a few days of the hearing. On January 17, 2012, Mother testified that she had not received any funds from the book since prior to the December 2010 hearing and that she did not expect to receive further sums from the book. Accordingly that portion of the Court's January 18, 2011 Order stating that the $10,000 attorney fee would be "paid no later than the date that Mother receives the next payment relating to the book that she has or is writing" is vacated and the judgment is due and owing from Mother to Father.

On appeal, Mother argues that the trial court lacked subject matter jurisdiction to modify the January 18, 2011 order regarding payment of attorney fees. We respectfully disagree. We read the trial court's order, *supra*, not as a modification of the original judgment of $10,000, but rather as a means of enforcing that judgment. In other words, the foregoing order does not reduce or increase the judgment against Mother. Based upon a change in circumstances, i.e., Mother not receiving anticipated payments from her book, the trial court merely lifted that criterion so as to enforce its previous order.

The very case that Mother relies upon in this section of her argument, ***Born Again Church & Christian Outreach Ministries, Inc. v. Myler Church Building Systems of the Midsouth, Inc.***, 266 S.W.3d 421 (Tenn. Ct. App. 2007), expressly states that, "[t]he filing of a notice of appeal does not prevent the trial court from ruling on ancillary matters relating to the enforcement or collection of its judgment." ***Id***. at 425, n.3 (citing ***First American Trust Co. v. Franklin-Murray Development Co., L.P.***, 59 S.W.3d 135, 141 n.8 (Tenn. Ct. App. 2001). It is well settled that a "trial court has the power and discretion to enforce its orders in the way it deems best." ***Wilkinson v. Wilkinson***, No. W2012-00509-COA-R3-CV, 2013 WL 614708 (Tenn. Ct. App. Feb. 19, 2013).

At the hearing in this case, Mother testified that, since December 17, 2010, she had not received any monies from her book; she further stated that she did not expect to receive further payment. If, as Mother suggests in her brief, the trial court is precluded from lifting the suspension of the $10,000 judgment until such time as Mother receives additional funds from her book, then (based on Mother's own testimony that she does not expect to receive additional funds), the judgment would never be enforced. In addition, as set out above, the trial court ordered Mother to pay the $10,000 into her attorney's escrow account. There is no dispute that she failed to comply with this order. Accordingly, we cannot conclude that the trial court erred in removing the book payment criterion from its order so that the

judgment could be enforced against Mother.

In her brief, Mother also contests the trial court's June 4, 2012 order, wherein it ruled that:

> Mother shall pay to Father the sum of $15,000 in partial payment of the attorney fees that he has incurred incident to his defense of Mother's petition and the filing and prosecution of his counter-petition. Father shall be, and is hereby, awarded a judgment against Mother in said amount. The Court finds this judgment to be necessary for the financial care and support of the minor child.

On appeal, Mother asserts that the fees and expenses awarded in the trial court's June 4, 2012 order were not reasonable. In the first instance, our review of the record indicates that Mother did not object to the reasonableness of the award at the trial level. As noted above, "[i]ssues not raised in the trial court cannot be raised for the first time on appeal," *Sparks v. Metro. Gov't of Nashville*, 771 S.W.2d 430, 434 (Tenn. Ct. App. 1989)(citing *Irvin v. Binkley*, 577 S.W.2d 677 (Tenn. Ct. App. 1978)). However, even if we allow the question, the amount of the fees awarded is supported by Father's attorney's affidavit.

Mother further argues that the trial court's award of attorney fees in its June 4 order was based upon its findings of criminal contempt, arguing that "[c]riminal contempt citations cannot be utilized for custody, visitation or attorney fees." We need not address whether Mother correctly states the law because it is clear from the record that the trial court based its award of attorney fees on the fact that Mother had committed numerous breaches of both the MDA and the Parenting Plan. As discussed below, both of these documents include provisions requiring the trial court, in the event of breach, to award fees to the non-breaching party.

## V. Protective Order

On December 16, 2011, Mother caused to be issued Subpoenas *Duces Tecum* to Horseshoe Hotel & Casino, Harrah's Hotel and Casino, Goldstrike Casino Resort, Fitzgerald's Casino, Sam's Town Hotel and Gambling Hall, and Hollywood Casino & RV Park, pursuant to which she requested that the casinos produce the following:

> [A]ny and all of the following documents: any and all invoices, receipts, gambling statements, alcohol purchases, room receipts, videotape, photographs or other documentation regarding the

patronage of [Father] from January 1, 2010 thru the return date
of this subpoena.

The response date set forth in the subpoenas was December 27, 2011. The record shows that although the subpoenas were issued on December 16, 2011, they were not sent to Father or his attorney on that date. Rather, the subpoenas were placed in the United States mail on December 20, 2011, and were accompanied by a transmittal letter from Mother's attorney dated December 19, 2011.

Father moved to quash the subpoenas and for a protective order, alleging that certain of the requested documents had already been produced. In his motion, Father argues that Mother's subpoenas were overly broad in that they sought records that preceded the date of the last hearing in the case, and that some of the documents sought were not relevant to any issue currently before the court. Due to the holidays, a hearing on Father's motion to quash was not held before the casinos had responded to the subpoenas.

At trial, Mother attempted to admit the records that were received pursuant to the subpoenas, including those records that pre-dated the trial court's December 17, 2010 order. Father objected on the ground of relevance and on the specific grounds set forth in his motion to quash. Mother countered that the contents of the subpoenaed documents were relevant, despite the fact that they pre-dated the December 2010 hearing, because they allegedly demonstrated that Father had testified inconsistently at that hearing. The asserted "inconsistency" was that Father had testified, in December 2010, that Mother had denied him parenting time during the second half of the summer of 2010 while casino records reflected that Father was at the casino for twelve days of the disputed period. The trial court ruled in favor of Father.

On appeal, Mother argues that the trial court lacked subject-matter jurisdiction to enter a protective order "regarding foreign subpoenas served within the State of Mississippi." At trial, Father moved the court to include, in any order from the proceedings, that Mother is not to disseminate any of the documents that she procured from the casinos. Mother's counsel responded that he "did not have a problem with that."

In her appellate brief, the entirety of Mother's argument on this issue reads:

MissRCivP45(d) and Miss. Code Ann. Sec 11-59-11 govern
protective orders regarding foreign subpoenas served with the

State of Mississippi.[3]   The rule and statute commit this jurisdiction to the Mississippi circuit court for the Mississippi county of issuance.  In the instant case, the Circuit Court of Tunica County, Mississippi would be the appropriate court for the Father to seek the type of protective order issued by this Court at paragraph 12 of the June 4, 2012 Judgment.  Mother only agreed to not disseminate the documents.

We glean from this "argument" that the issue pursued by Mother rests upon the portion of the trial court's order requiring Mother "to deliver all copies (with the exception of that contained within the record in this case) to counsel for Father."  The trial court's June 4 order states:

> During the pendency of these proceedings, counsel for Mother caused to be issued subpoenas to various casinos in the state of Mississippi seeking documents and things relating to Father. The Court declined to admit these records (marked for identification only as Exhibit 40) into evidence, finding that they were not relevant to any issue before the Court and did not bear on Father's credibility.  Counsel for Mother is instructed not to disseminate the records and to deliver all copies (with the exception of that contained within the record in this case) to counsel for Father.

Mother points to no authority, nor do we find any in our research, which would preclude the trial court from instructing Mother to deliver copies of the subpoenaed documents to Father.  Furthermore, from the trial court's order, it appears that it did not actually consider the documents as grounds for any substantive ruling.  Moreover, Mother's argument that Father should be made to litigate this issue in the Circuit Court of Tunica County, Mississippi is not supported by any argument in the brief and appears to overlook the fact that Tunica County Mississippi is a forum that has no legitimate interest in the issues raised in this case, nor do the parties appear to have any significant contact with that State. From the record and the lack of argument in Mother's appellate brief, we cannot conclude

---

[3] Mississippi Code Annotated Section 11-59-11 provides:

> An application to the court for a protective order or to enforce, quash or modify a subpoena issued by a clerk of court under Section 11-59-5 must comply with the rules or statutes of this state and be submitted to the court in the county in which discovery is to be conducted.

that the trial court committed reversible error in instructing Mother's attorney to profer the subpoenaed documents to Father's counsel. Additionally, because the subpoenaed documents did not form the basis for any substantive ruling, if there was error, it was harmless. Tenn. R. App. P. 36(b).

## VI. Evidence Admitted through the Testimony of Anna Cladakis

Ms. Cladakis was Father's girlfriend at the time of the hearing in this case. The disputed evidence, which was admitted through her testimony were "screen shots" from the Tennessee Department of Transportation ("TDOT") and Arkansas Department of Transportation ("ADOT") websites for road conditions on December 30, 2011. On that date, Father had asked his brother to meet Mother at the McDonald's in Brinkley, Arkansas to exchange the child. According to the testimony, Mother did not arrived at the scheduled meeting time of 6:00 p.m.; rather, she showed up at approximately 6:58 p.m. In response to questions concerning her time of arrival, Mother testified in relevant part that:

> A. I'm not exactly sure what time. We [Mother and her sister, who was in the car with her] were in direct communication with my brother-in-law. And if you can pull up records, there was a tractor-trailer on fire on 40. It was blocked up to one lane. We had been sitting there [for] a while.
>
> Q. Okay. Well, interesting that you would say that because I did actually have some records pulled up—
>
> A. Okay.
>
> Q. —on what traffic conditions were at the time.
>
> A. I may can get my sister-in-law to send a picture, because I told her to take a picture of it, too, when we went by.
>
> Q. Let me pass to you—what I've handed to you is a —the first one is a TDOT screenshot showing what the traffic conditions were at 6:46 p.m. on December 30th. Do you see that in the lower right-hand corner?
>
> A. Yes, and I do not know what TDOT is. And I'm not sure that it's even accurate. I know nothing about TDOT.

Q. Okay. So you don't know that that's the Tennessee Department of Transportation.

A. We weren't in Tennessee. We were in Arkansas.

Q. Okay. Now, let's go to the next page. Okay. Now, on the second page, do you see the time at the bottom right-hand screen that says December 30th of 2011?

A. Yes.

Q. Okay. And do you see that that—the map that's on there is the state of Arkansas?

A. As far as I can tell.

Q. And do you see that red line going from West Memphis down to Brinkley?

A. Sure.

In her testimony, Ms. Cladakis stated that on December 30, 2011, at Father's request, she had researched highway conditions in Tennessee and Arkansas by viewing the TDOT and ADOT websites:

> A. [Father] asked me to look up some traffic. . . . And I said, oh, that's easy, you go to the Department of Transportation. We have that local here. Every state has it available to you. And it's real time.
>
> Q. Okay.
>
> COUNSEL FOR FATHER: Your Honor, if I may pass this to Ms. Cladakis the exhibit that has been previously marked [i.e., containing the screenshots from TDOT and ADOT].
>
> COUNSEL FOR MOTHER: Objection—
>
> COUNSEL FOR FATHER: —for identification only.

THE COURT: What are we doing, to show that there wasn't traffic?

COUNSEL FOR FATHER: The roads were clear from Memphis to Brinkley, Arkansas is what we're showing.

COUNSEL FOR MOTHER: It's still hearsay. She has no personal knowledge of what was the accurate—

THE COURT: Are these Department of Transportation documents that you received—

COUNSEL FOR FATHER: No, they—what happened, as she just explained so I'm not offering testimony, you can log on at any given time to the DOC website in certain—

\*                                 \*                                 \*

THE WITNESS: I printed it and sent it to [Father] . . . on the email . . .

THE COURT: You know, those are self-authenticating documents but I'm not sure about pulling them off the Internet. But if you want—I'm going to let her tell us whether she relied on those for traffic, and I need a date and time.

\*                                 \*                                 \*

Q. Now, Ms. Cladakis, does the first page reflect what was available on the [TDOT] website?

A. Yes, it does.

Q. And what was the date and time of the screenshot?

A. At the time that we—that I sent this, it was December 30th at 6:47 p.m.

Q. Now, is the second page a screenshot from the [ADOT] site?

A.  Yes.

Q.  And what is the date and time of the screenshot?

A.  It is now December 30th at 7:00 p.m..

COUNSEL FOR FATHER: Your Honor, I would move for those to be admitted into evidence.

COUNSEL FOR MOTHER: Your Honor, same objection. They're still hearsay.

THE COURT: They are hearsay, but I'm going to let her testify whether she found there was any congestion or not.

Q.  Now, based on your review of those documents, did it appear that there had been an accident that was impeding traffic flow on Interstate 40 between Memphis and Brinkley, Arkansas?

COUNSEL FOR MOTHER: Objection on personal knowledge, as well, Your Honor.  She wasn't out there.

THE COURT: I'm going—you know, I—this is the way I drive. Any responsible driver does it.  And I want her to testify to it.

Q.  Ms. Cladakis, based on your review of the Department of Transportation websites, were you able to ascertain whether there was a traffic delay on I-40 between Memphis and Brinkley?

A.  It was wide open.

On appeal, Mother argues that the screenshots were improperly admitted.  Father argues that Mother's objection to the admission was based solely on hearsay, and that the trial court sustained that objection, stating "[t]hey are hearsay."  Although Father contends that Mother did not object to Ms. Cladakis' lack of personal knowledge concerning traffic conditions on December 30th, it appears from the foregoing that she did make that objection. Regardless, we have reviewed the record and it does not appear that the trial court actually admitted the screenshots into evidence; rather, they were marked for identification only.

Furthermore, from our review, it does not appear that either Ms. Cladakis' testimony, or the Department of Transportation screenshots formed the basis for any of the trial court's substantive rulings. At most, these documents provided additional support for a finding that Mother was late for the drop-off—a fact that Mother had already admitted in her testimony. Accordingly, if there was error surrounding the handling of the TDOT or ADOT screenshots, it was harmless error. Tenn. R. App. P. 36(b).

## VII. Dr. Amy Beebe's Testimony

The record reveals that Amy Beebe is a psychologist, licensed to practice in the State of Tennessee. The referring questions that Dr. Beebe was asked to examine were whether the child appeared to be on grade level, and whether the A Beka curriculum was on par with the local public school curriculum. At trial, she submitted her Curriculum Vitae, which sets forth her education and work experience. In relevant part, Dr. Beebe testified that she has been licensed since 1992 to do "therapy as well as [] testing and evaluation for learning disabilities, school placement." In addition, Dr. Beebe stated that she has done "gifted assessments for Shelby County Schools." Dr. Beebe is on the board of the Bodine School, and has worked with other schools in and around the Memphis area. Based upon this testimony, Father tendered Dr. Beebe as an expert in the areas of psychology and educational assessment:

> COUNSEL FOR FATHER: And, Your Honor, I tender Dr. Beebe as a witness in the areas of child psychology and educational assessment.

Mother's attorney then asked for permission to *voir dire* the witness, which permission was granted. Following *voir dire*, Mother's attorney objected to Dr. Beebe's being admitted as an expert on the following grounds:

> COUNSEL FOR MOTHER: Okay. Your Honor, I think we would object to this witness testifying in the area of psycholog[y]. She has not examined any medical records or clinical records of [the child].
> We would also object to her testifying as an expert in regard to educational assessment. We think a 90-minute time frame to examine [the child] and the records not being there before he was being examined makes her opinion—makes her opinion very questionable in this matter.

The transcript continues:

THE COURT: Okay. Do you [Mother's attorney] want to address the question of [Dr. Beebe's] qualifications or do you want me to just rule?

COUNSEL FOR FATHER: Your Honor, to the extent that [Father's] objection was with respect to Dr. Beebe being tendered as a child psychologist expert, we do not anticipate offering testimony from her about [the child's] psychological state.

Now, [Father's] objection suggested that there were psychological records for this child that should have been reviewed, which is not the case.

THE COURT: I have a question [about] that. Clinical records, are there clinical records somewhere?

COUNSEL FOR FATHER: There are not, Your Honor. . . . But Dr. Beebe's psychological background certainly comes into play with all the educational assessments and the interpretation of the—

THE COURT: Let me stop you. Dr. Beebe's had—you may not know Dr. Beebe. She's testified many times in this courthouse including in this courtroom. You are correct that it's primarily on a psychological basis.

But her testimony just now that she does assessment for the city schools, county schools, private schools shows that she has extensive experience and sort of testing that she says she does, and I don't know whether she did it on this child. But I think she has the expertise and she's been an expert for many years around here. She's one of the few who will still come to court and testify, as we all know. So I'm willing to declare her an expert.

A trial court's decision concerning the competency of an expert witness is reviewed by this Court under an abuse of discretion standard. As discussed by this Court in *Carpenter v. Klepper*, 205 S.W.3d 474 (Tenn. Ct. App. 2006):

A trial court has broad discretion in determining the "admissibility, qualifications, relevancy and competency of

-42-

expert testimony." ***McDaniel v. CSX Transp.***, 955 S.W.2d 257, 263 (Tenn.1997). Questions regarding the qualifications of expert witnesses are left to the trial court's discretion and may be overturned only if that discretion is abused. ***McDaniel***, 955 S.W.2d at 263. The Tennessee Supreme Court has defined an abuse of discretion to mean "an erroneous conclusion or judgment on the part of the trial judge-a conclusion that was clearly against logic (or reason) and not justified." ***Foster v. Amcon Int'l, Inc.***, 621 S.W.2d 142, 145 (Tenn. 1981).

***Carpenter***, 205 S.W.3d at 477. Based upon Dr. Bebee's educational background and specific experience with local schools, we cannot conclude that the trial court's overruling of Mother's objection was error. From the record, Dr. Bebee appears to be well qualified to testify as an expert in this case.

After being admitted as an expert, Dr. Beebe testified, concerning the child, that she: (1) had reviewed the child's records from his elementary school; (2) had spent approximately one and one-half hours with the child; (3) she was familiar with the A Beka home schooling program prior to being consulted on this case; (4) she works with many children who are home schooled; (5) performed an educational screening of the child; (6) discerned that the child was average to above average in all areas according to standard scores; (7) discerned that the child tested exceptionally well in math and phonics; (8) discerned that the child likely had an above average IQ. The foregoing testimony was made relevant to this case by Mother's allegation that "[s]ince the change in custody, [Son's] circumstances have deteriorated due to the actions of Father. Father enrolled the child in an unaccredited home school program." Dr. Beebe testified that A Beka was, in fact, accredited: "[The A Beka Program] is nationally recognized and accredited. It's also used in many . . .private Christian school settings." Dr. Beebe was able to give some history of the A Beka Program, and stated that it was thirty-years old, and had been "researched and tested." Dr. Bebee also testified that she had worked with other children who were enrolled in the A Beka Program.

The fact that Dr. Beebe spent ninety minutes with the child is not dispositive of the question of her qualification to testify as to the A Beka curriculum, or as to Son's grade level. Furthermore, Mother's argument that Dr. Beebe failed to review any medical or clinical records in this case is disingenuous given the fact that none exist.

Mother further argues that the trial court erred "in authorizing Dr. Beebe to testify regarding speech therapy pursuant to Rule 702 and 703 of Evidence." It is clear from the record that, contrary to Mother's position, Dr. Beebe was not proferred as an expert in the area of speech therapy. In fact, her testimony concerning the child's speech therapy was

limited to the way that speech and language problems "dovetail" (in Dr. Beebe's words) with the child's educational needs. Dr. Beebe testified broadly that she had experience with children who have speech and language issues, and that she often refers children with these issues to speech therapists. In short, her experience with speech therapy is based mostly on the referrals she makes; Dr. Beebe specifically testified that she does not diagnose speech disorders, but only recognizes when there is a possibility that a child may need extra help in this area. At that point, she simply refers the child to a qualified speech therapist. Concerning Son, the extent of Dr. Beebe's testimony regarding speech therapy was that, during her evaluation, she noticed that he stutters, and thus concluded that he was in need of therapy. She noted broadly that "[w]hen you have speech and language problems, it can impact your ability to function in the classroom, especially with reading and following directions. There is a dovetail." Dr. Beebe's observation that a child with speech and language problems might have difficulty in the classroom is an opinion based in logic, not expertise. Accordingly, we cannot conclude that Dr. Beebe was allowed to testify outside the parameters of her qualifications as set by the trial court.

### VIII. Father's Attorney Fees on Appeal

Father has asked this Court to award his attorney fees and expenses incurred in defense of this appeal. As briefly noted above, the parties' MDA, which was incorporated into the Final Decree of Divorce, provides, in relevant part that:

> 19. In the event that it should be determined, either by this Court or by any other court of competent jurisdiction, that either party has willfully breached any provision of this Agreement, then the breaching party shall pay the other party all reasonable attorneys' fees and costs incurred in the enforcement of any such provision or provisions as such are adjudged by the Court upon full hearing.

Likewise, the Parenting Plan, which was also incorporated into the Final Decree of Divorce provides:

> In the event that it should be determined, either by this Court or by any other court of competent jurisdiction, that either party has breached any provision of this Plan, then the breaching party shall pay to the other party all reasonable attorneys' fees and costs incurred in the enforcement of any such provision or provisions as such are adjudged by the Court upon full hearing.

-44-

Based upon the foregoing provisions, and the fact that we have affirmed the trial court's findings concerning various acts of contempt on the part of Mother for violation of the mandates of the Parenting Plan and the MDA, we are of the opinion that Father is entitled to his fees and expenses incurred in defense of this appeal. Accordingly, we grant Father's request for his attorney fees and expenses and remand for a determination of the amount thereof.

For the foregoing reasons, we reverse the order of the trial court concerning modification of Father's child support obligation. The order of the trial court is affirmed in all other respects. The case is remanded to the trial court for further proceedings as may be necessary and are consistent with this Opinion, including, but not limited to, calculation of the amount of attorney's fees and expenses incurred by Father in defense of this appeal and entry of judgment for same. Costs of the appeal are taxed against the Appellant Mother, and her surety.

_____

J. Steven Stafford, Judge